**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTH IDAHO COMMUNITY ACTION
NETWORK,
           *Plaintiff-Appellant,*

        v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION; MARY E.
PETERS,* U.S. Secretary of
Transportation; UNITED STATES
FEDERAL HIGHWAY ADMINISTRATION;
THOMAS J. MADISON, JR.,**
Administrator, U.S. Federal
Highway Administration; PETER
HARTMAN,*** Division
Administrator, Idaho Division,
U.S. Federal Highway
Administration; EDWIN B. JOHNSON,
Field Operations Engineer, Idaho
Division, U.S. Federal Highway
Administration; UNITED STATES
FISH & WILDLIFE SERVICE; IDAHO
TRANSPORTATION DEPARTMENT;

No. 08-35283

D.C. No.
2:05-CV-00273-EJL

OPINION

---

*Mary E. Peters is substituted for her predecessor, Norman Mineta, as U.S. Secretary of Transportation, pursuant to Fed. R. App. P. 43(c)(2).

**Thomas J. Madison, Jr., is substituted for his predecessor, Mary E. Peters, as Administrator of the U.S. Federal Highway Administration, pursuant to Fed. R. App. P. 43(c)(2).

***Peter Hartman is substituted for his predecessor, Steve Mareno, as Division Administrator, Idaho Division, U.S. Federal Highway Administration, pursuant to Fed. R. App. P. 43(c)(2).

PAMELA LOWE,**** Director, Idaho
Transportation Department,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
August 25, 2008—Seattle, Washington

Filed October 6, 2008

Before: Thomas G. Nelson, Michael Daly Hawkins, and
Jay S. Bybee, Circuit Judges.

Per Curiam Opinion

----

****Pamela Lowe is substituted for her predecessor, David S. Ekern,
as Director, Idaho Transportation Department, pursuant to Fed. R. App. P.
43(c)(2).

**COUNSEL**

Matthew K. Bishop, Western Environmental Law Center, Helena, Montana, for the plaintiff-appellant.

Deborah A. Ferguson, Assistant United States Attorney, Office of the United States Attorney for the District of Idaho, Boise, Idaho, for appellee United States of America; Murray D. Feldman, Holland & Hart, LLP, Boise, Idaho, for appellees Idaho Transportation Department, et al.

## OPINION

PER CURIAM:

Plaintiff North Idaho Community Action Network ("NICAN") appeals the district court's grant of summary judgment in favor of defendants United States Department of Transportation (the "DOT"), Federal Highway Administration, and Idaho Transportation Department (collectively, the "Agencies"). NICAN challenges a proposed highway construction project on a portion of U.S. Highway 95 located in northern Idaho. NICAN claims that the Agencies violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c). We affirm in part, reverse in part, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

U.S. Highway 95 ("US-95") currently runs through the heart of downtown Sandpoint, Idaho, and is the only highway that ties northern Idaho to southern Idaho. The proposed highway construction project (the "Project") will improve US-95 in and around Sandpoint.

The Project will be funded and constructed in four separate phases. The first, second, and fourth phases involve widening the existing highway to four lanes. The third phase involves realigning an approximate two-mile stretch of US-95 to create a byway that will route the highway to the east of Sandpoint

and remove through-traffic from the downtown Sandpoint area. Because the Agencies deem the third phase to be the most important phase of the Project, the Agencies have proceeded with that phase first.

In September 1999, the Agencies approved a final environmental impact statement (the "1999 EIS") for the Project. In May 2000, the Agencies issued a record of decision (the "ROD") for the Project. In the ROD, the Agencies selected the "Sand Creek Byway" as the preferred alternative for the third phase of the Project. As initially planned in the 1999 EIS, the Sand Creek Byway involved constructing two miles of new two-lane highway along the east side of Sand Creek, building a partial interchange/bridge structure over Sand Creek and Bridge Street, and building a full diamond interchange at the junction of US-95 and State Highway 200.

In April 2005, the Agencies released an environmental assessment (the "2005 EA") that included various changes to the Project design described in the 1999 EIS. These changes all relate to the third phase of the Project, the Sand Creek Byway, and were made in response to input from various members of the local community. The changes include traffic design modifications—such as building additional off-ramps and adding a third lane for safer merging—as well as aesthetic improvements and mitigation measures—such as constructing a pedestrian and bicycle pathway along Sand Creek and building three artificial habitat enhancement areas in Sand Creek. The 2005 EA concluded that the changes to the Project design would not have significant impacts beyond those already considered in the 1999 EIS. Based on this conclusion, the Agencies issued a Finding of No Significant Impact ("FONSI").

In August 2006, the Agencies prepared an environmental reevaluation (the "2006 Reevaluation") covering the Project. The 2006 Reevaluation set forth additional changes to the Project design and assessed possible environmental effects of those changes. The majority of the changes involve dredging

Sand Creek and will result in the removal of approximately 17,035 cubic yards of material from Sand Creek. The 2006 Reevaluation concluded that there was no additional significant impact and that neither a supplemental environmental impact statement ("SEIS") nor an environmental assessment ("EA") was required.

In July 2005, after the Agencies released the 2005 EA and issued its FONSI determination, but before the Agencies prepared the 2006 Reevaluation, NICAN filed suit in the district court challenging the Agencies' approval of the Project. On the parties' cross-motions for summary judgment, the district court granted summary judgment in favor of the Agencies and against NICAN.

NICAN moved for an injunction pending appeal, which the district court denied. NICAN then sought and obtained an injunction pending appeal from a motions panel of this court. After oral argument in this expedited appeal, we lifted the injunction and allowed construction of the Sand Creek Byway to commence. This Opinion sets forth the explanation for our decision.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). The Administrative Procedure Act ("APA") provides authority for the court's review of decisions under NEPA and Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c). *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006); *Alaska Ctr. for the Env't v. Armbrister*, 131 F.3d 1285, 1288 (9th Cir. 1997). Under the APA, a reviewing court may set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As this court recently explained:

> Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for that of the agency. Rather we will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal quotations and citations omitted).

## DISCUSSION

### I.   NEPA

"NEPA 'is our basic national charter for protection of the environment.' " *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). Although NEPA does not impose any substantive requirements on federal agencies, it does impose procedural requirements. *See Lands Council*, 537 F.3d at 1000. Through these procedural requirements, NEPA seeks to make certain that agencies " 'will have available, and will carefully consider, detailed information concerning significant environmental impacts,' and 'that the relevant information will be made available to the larger [public] audience.' " *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

NICAN argues that the Agencies violated NEPA's procedural requirements by (a) failing to consider alternatives to changes to the Project set forth in the 2005 EA, (b) failing to disclose and assess in the 2005 EA the impacts of dredging Sand Creek, (c) failing to consider a tunnel alternative for the Project, (d) failing to consider the impacts the Project will

have on historical properties, and (e) failing to prepare a supplemental environmental impact statement. We address each of these claims in turn.

## A.    Failure to Consider Alternatives

NICAN argues that the Agencies violated NEPA by failing to consider alternatives to the various changes to the Project design set forth in the 2005 EA. We disagree.

**[1]** NEPA requires the agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This "alternatives provision" applies whether an agency is preparing an environmental impact statement ("EIS") or an environmental assessment ("EA"), and requires the agency to give full and meaningful consideration to all reasonable alternatives. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005). However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Id.* at 1246. Thus, whereas with an EIS, an agency is required to "[r]igorously explore and objectively evaluate all reasonable alternatives," *see* 40 C.F.R. § 1502.14(a), with an EA, an agency only is required to include a brief discussion of reasonable alternatives. *See* 40 C.F.R. § 1508.9(b).

NICAN does not dispute that the Agencies adequately explored and evaluated reasonable alternatives to the Project in preparing the 1999 EIS. NICAN also does not challenge the Agencies' selection, in the ROD, of the Sand Creek Byway as the preferred alternative. Rather, NICAN argues that the Agencies violated NEPA because they failed to consider alternatives to the various changes to the Project design set forth in the 2005 EA.

**[2]** In the 2005 EA, the Agencies considered and briefly discussed two alternatives: the Project with the changes pro-

posed in the 2005 EA, and the Project without the proposed changes (i.e., proceeding with the Project as previously described in the 1999 EIS). As discussed in Section I.E. below, the changes to the Project proposed in the 2005 EA will not result in significant environmental effects that were not previously evaluated in the 1999 EIS. Under these circumstances, we hold that the Agencies fulfilled their obligations under NEPA's alternatives provision when they considered and discussed only two alternatives in the 2005 EA. *See Native Ecosystems*, 428 F.3d at 1245-49 (holding that the agency complied with NEPA's alternatives provision in preparing an EA where the agency considered only two alternatives—a no action alternative and a preferred alternative); 40 C.F.R. § 1508.9(b) (requiring only a brief discussion of reasonable alternatives in an EA).

## B.   Failure to Disclose/Analyze Dredging

NICAN argues that the Agencies violated NEPA by failing to disclose and assess in the 2005 EA, or a supplemental EA, the impacts of dredging Sand Creek. We disagree.

Prior to issuance of the 2005 EA, there were internal discussions within the Agencies regarding the possible need for the excavation or dredging of Sand Creek. There also was, however, a good deal of uncertainty within the Agencies about whether dredging would be required and, if so, the extent of that dredging. For example, the initial application to the Army Corps of Engineers indicated a belief that no dredging would be required. And shortly before the 2005 EA was issued, hydraulics engineers were still examining at least three dredging alternatives, and the design remained "subject to change."

The Agencies could not adequately or meaningfully evaluate the environmental impacts of any potential dredging until they had more information, which depended at least in part on ongoing discussions with the Army Corps of Engineers and

the Clean Water Act permitting process. Once additional information regarding the proposed dredging was available, the Agencies performed the 2006 Reevaluation to analyze the dredging and its projected impacts, and to determine whether the new information required the preparation of a SEIS or a supplemental EA. *See Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000); *Price Road Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997); 23 C.F.R. § 771.129(a) (1988). The Agencies concluded that the dredging would not have significant environmental impacts beyond those already considered, and thus that neither a SEIS nor a supplemental EA was required.

The Agencies' use of the reevaluation process is substantially similar to that approved in *Price Road*, 113 F.3d at 1510, and we find no fault with the Agencies' use of that process here.

In *Price Road*, a freeway project initially contemplated two below-ground enclosed tunnels but was revised to include two fully-directional loop ramps instead of the tunnels. *Id.* at 1507-08. The Agencies considered, in an environmental reevaluation, the environmental effects of the changes and determined there were no discernible differences in the level of environmental impacts beyond those previously considered. *Id.* at 1508. The agency thus did not prepare an EA or EIS for the changes. *Id.*

[3] We noted that, while NEPA does not specifically address how an agency should decide when changes require a more formal EA or EIS, the Federal Highway Administration had specifically provided for reevaluations as a means to determine whether or not the approved environmental document remains valid. *Id.* at 1509-10 (citing 23 C.F.R. § 771.129(c)). We thus concluded that if the agency, after the requisite "hard look" in a reevaluation, determines that the new impacts will not be significant (or not significantly different from those already considered), then the agency is in

full compliance with NEPA and is not required to conduct a supplemental EA. *Id.* at 1510; *see also Highway J Citizens Group v. Mineta*, 349 F.3d 938, 959-60 (7th Cir. 2003) (holding that when a "known issue came into sharper focus after the formal environmental documents were issued," it was not improper to use internal reevaluation to analyze the issue).

**[4]** In the present case, the Agencies took the requisite "hard look" at the impacts of dredging Sand Creek in the 2006 Reevaluation, and determined that there were no new impacts that were significantly different than those already considered and that neither a SEIS nor a supplemental EA was therefore required. We hold that the Agencies did not act arbitrarily or capriciously in making those determinations, and that they complied with NEPA in their evaluation of the proposed dredging.[1]

## C.   Tunnel Alternative

NICAN argues that the Agencies violated NEPA by failing to consider a new tunnel alternative for the Project. Again, we disagree.

**[5]** Agencies have a continuing obligation to consider new information that comes to light, even after the issuance of an EIS. *See* 40 C.F.R. § 1502.9 (c)(1)(ii) (requiring the agency to prepare supplements to either draft or final environmental impact statements if "[t]here are significant new circumstances or information relevant to environmental concerns and

---

[1]NICAN's reliance on *Idaho Sporting Cong.*, 222 F.3d at 566-67, is misplaced. In that case, this court already had determined there were deficiencies in the agency's EA and EIS. Rather than issue a revised EA and EIS to address those deficiencies, the agency improperly attempted to address the deficiencies through issuance of a supplemental information report ("SIR"). In contrast, in the present case, as in *Price Road*, the reevaluation process was used not in an attempt to correct deficiencies in an EA or EIS, but instead to make an ex-ante decision about the need for a SEIS or supplemental EA.

bearing on the proposed action or its impacts"); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 373-74 (1989) ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. . . . On the other hand, . . . NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval."); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000) ("When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require [a supplemental EIS].") (internal quotation marks and citation omitted); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 444-45 (4th Cir. 1996) (holding that the agency violated NEPA by failing to take a "hard look" at new information regarding zebra mussel infestation).

**[6]** This continuing obligation, however, extends only to new *information or circumstances* regarding environmental impacts that may not have been appreciated or considered when the EIS was prepared. An agency is not required by NEPA to consider new *alternatives* that come to light after issuance of the EIS absent "substantial changes in the proposed action relevant to environmental concerns," or "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9 (c)(1); *see* 40 C.F.R. § 1502.14.

**[7]** Here, the tunnel alternative is not new "information" or a new "circumstance" regarding environmental impacts that may not have been appreciated or considered when the 1999 EIS was prepared, and there is no substantial change in the Project that is "relevant to environmental concerns." Accordingly, we hold that the Agencies did not violate NEPA by fail-

ing to consider the tunnel alternative when it was brought to their attention in 2006.[2]

## D.   Impacts to Historic Properties

NICAN argues that the Agencies violated NEPA by: (1) taking a "phased approach" to how the Project will impact historic properties, and (2) failing to take a "hard look" at how the construction and operation of the Project will impact the Burlington Northern Railroad Depot (the "Depot"). We disagree and hold that the Agencies fully complied with NEPA on this issue.

[8] NEPA requires federal agencies to consider the *environmental* impact of major federal action. *See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (citing 42 U.S.C. § 4332(2)(C)); *see also Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 223-25 (5th Cir. 2006). NEPA has no independent requirement that an agency examine, separate and apart from any environmental impacts, the impact that a federal action will have on historic properties. NICAN's reliance on NEPA regulations requiring consideration of environmental impacts to support its historic-property-impact argument is therefore misplaced.

[9] Moreover, although an EIS is required to include "discussions" of "historic and cultural resources," *see* 40 C.F.R. § 1502.16(g), the Agencies' 1999 EIS complied with this requirement. The 1999 EIS considered the impacts the Project is anticipated to have on historic properties, primarily focusing on the impacts of the Sand Creek Byway alternative ver-

---

[2]Moreover, because the tunnel alternative was not raised and identified until June 2006, well after the notice and comment periods for the 1999 EIS and the 2005 EA closed, any objection to the failure to consider that alternative has been waived. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) (holding that objections to the failure to consider alternatives beyond those evaluated in the EA were forfeited by failure to identify additional alternatives during notice and comment period).

sus a through-town couplet alternative. The Agencies ultimately chose the Sand Creek Byway alternative, in part because the through-town couplet alternative potentially would have impacted numerous historic sites, whereas the Sand Creek Byway alternative only would potentially impact the Depot and some underground sites.[3]

The 1999 EIS recognized possible noise and vibration impacts, noted general steps that would be taken to minimize impacts, and indicated that additional surveys and mitigation measures would be undertaken after selection of the preferred route. The 2005 EA included a more detailed noise analysis following testing and modeling, which concluded that there were no significant adverse effects from the Project.[4] The 2005 EA also described various mitigation procedures to protect the Depot from other construction activities, including the changes to the Project and ongoing monitoring, developed in consultation with the State Historic Preservation Officer ("SHPO").[5]

[10] We hold that the broad overview in the 1999 EIS of the Project's impacts on historic properties, coupled with the specific, detailed analysis of the impacts of the Sand Creek Byway, and mitigation measures to minimize those impacts, was more than sufficient to meet NEPA's requirements in relation to historic properties.[6]

---

[3]These underground sites could be protected by simply preserving anything unearthed off-site.

[4]We defer to the Agencies' interpretation of these data. *Lands Council*, 537 F.3d at 993-94.

[5]In determining whether the potential construction effects would likely be significant, the Agencies are permitted to take into account mitigation measures which reduce the impact of construction. *See Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000).

[6]The sufficiency of the Agencies' analysis under Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), is discussed separately in Section II.A. below.

## E. Failure to Prepare a SEIS

**[11]** An agency is not required to prepare a SEIS every time new information comes to light. *See Marsh*, 490 U.S. at 373. Rather, a SEIS is required only if changes, new information, or circumstances may result in significant environmental impacts "in a manner not previously evaluated and considered." *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (citation omitted). To assist the agency in determining whether a SEIS is required, an agency may prepare an environmental report (such as a reevaluation) or an EA. *See* 23 C.F.R. §§ 771.119(a), 771.129, 771.130(c).

**[12]** Here the agencies prepared both an EA and a reevaluation. In these documents, the Agencies considered the changes to the Project and the impacts of those changes. Although the changes would have somewhat different impacts from those previously analyzed in the 1999 EIS, the Agencies determined that those impacts were not significant or adverse enough to require a SEIS.

NICAN argues that the Agencies acted arbitrarily and capriciously by failing to prepare a SEIS regarding the changes to the Project discussed in the 2005 EA and the 2006 Reevaluation. NICAN contends that a SEIS was required because of impacts to wetlands, cumulatively significant impacts, controversial or uncertain impacts, and adverse impact on historic sites. *See* 40 C.F.R. § 1508.27(b) (discussing factors which should be considered in evaluating intensity of impact). We disagree and hold that a SEIS was not required.

As modified, the Project affected only an additional 0.32 acres of wetlands, which was also mitigated by construction of 1.1 acres of additional wetland area in a different location. *See Wetlands Action Network*, 222 F.3d at 1121 (holding that an agency can consider mitigation effects that minimize the impacts of a project in determining the significance of the

project's environmental impact). Further, the changes to the Project relating to the Depot were in response to requests by the SHPO to mitigate and protect the Depot from adverse effects, and were not adverse consequences in and of themselves. *Cf. Enos v. Marsh*, 769 F.2d 1263, 1373-74 (9th Cir. 1985) (holding that it was not arbitrary and capricious for the agency to find no adverse effect on archeological sites when that finding was consistent with the opinion of a SHPO).

Moreover, the uncertainty and controversy relied on by NICAN are not directed to the changes in the Project, but to the Sand Creek Bypass alternative itself. That alternative was discussed and evaluated in the 1999 EIS, and any challenge to the selection of that alternative has been waived. *Cf. Dep't of Transp.*, 541 U.S. at 764-65 (holding that objections to the failure to consider alternatives beyond those evaluated in the EA were forfeited by failure to identify additional alternatives during notice and comment period).

Finally, the Agencies sufficiently considered the cumulative impacts of the Project. In the 1999 EIS, the Agencies discussed and analyzed the environmental impacts of the Project as initially proposed. In the 2005 EA and 2006 Reevaluation, the Agencies determined that the changes to the Project did not significantly impact the environment in a way not previously considered. NICAN has pointed to nothing that convinces us that these determinations by the Agencies were inaccurate, let alone arbitrary or capricious.

**[13]** We hold that the Agencies' determination that the changes to the Project would not significantly impact the environment in a way not previously considered, and that a SEIS therefore was not required, was not arbitrary or capricious. *See Marsh*, 490 U.S. at 373-74; *see also Westlands Water Dist.*, 376 F.3d at 873.

## II.   Alleged Violations of Section 4(f) of the Department of Transportation Act

All federally funded highway projects must comply with not only federal environmental protection laws, such as NEPA, but also with historic preservation laws, including Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f ("§ 106"), and Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c) ("§ 4(f)").

Section 106 is a procedural statute that describes the process by which a project's impacts to historical sites are identified. It provides that before a federal agency may authorize the expenditure of funds for a federal or federally assisted project, the agency must first consider the effects of the project on "any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f.

Section 4(f), in contrast, imposes a substantive mandate. *See* 49 U.S.C. § 303(c). It allows a federal project "requiring the *use* of land of an historic site" to be approved only if "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c) (emphasis added).

NICAN argues that the Agencies violated § 4(f) by (a) failing to survey, identify, and evaluate § 4(f) properties for all four phases of the Project, and (b) determining that a § 4(f) analysis was not required because the construction and operation of the Project would not result in "use" of the Depot. We examine each of these claims in turn.

### A.   Failure to Evaluate § 4(f) Properties for all Four Phases of the Project

NICAN argues that the Agencies violated § 4(f) by failing to survey for, identify, and evaluate the impacts on historic

properties for all four phases of the Project as required by § 106 and § 4(f).

The Agencies concede that they have taken a phased approach and have conducted a detailed § 106 identification process and § 4(f) evaluation only with respect to the Sand Creek Byway phase of the Project, and have not done so with respect to the remaining three phases of the Project. Further, the Agencies correctly point out that the regulations governing the § 106 process allow a phased approach to identifying historic properties in some circumstances. *See* 36 C.F.R. § 800.4(b)(2); 36 C.F.R. § 800.8(a)(1).

**[14]** However, § 4(f) and its regulations require that the § 4(f) evaluation be completed before an agency issues its ROD. *See* 23 C.F.R. § 771.135(b) ("Any use of lands from a section 4(f) property shall be evaluated early in the development of the action *when alternatives to the proposed action are under study*.") (emphasis added); 23 C.F.R. § 771.135(i) (2007) (stating that evaluation of alternatives to using § 4(f) property should be presented in an EIS or EA); 23 C.F.R. § 771.135(l) (stating that if an EIS is required for a project, the agency should conduct the § 4(f) analysis in the EIS or ROD).[7] And because the § 4(f) evaluation cannot occur until after the § 106 identification process has been completed, the § 106 process necessarily must be complete by the time the ROD is issued. *See, e.g.*, 49 U.S.C. § 303(d)(2) (allowing the Secretary to find § 4(f) de minimis impact only if that determination has been developed in the consultation process required under § 106).

The District of Columbia Circuit reached the same conclu-

---

[7]These regulations were in effect at the time of the Agencies' decision in this case. They have been removed and replaced with similar ones as of April 11, 2008. 23 C.F.R. § 774.9 (a) & (b) still provide that § 4(f) properties must be evaluated early while alternatives are under study, and that the § 4(f) approval should appear in the EIS or ROD.

sion in a markedly similar case, *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368 (D.C. Cir. 1999). In *Corrider H*, the agency approved a plan for building a lengthy highway corridor, which was divided into fourteen segments. *Id.* at 371. The EIS selected an alternative that required the agency to identify historic properties in each segment in sequence and provided that no work would proceed where the treatment of historic properties had not been finalized. *Id.* The ROD, approving the selected alternative, recognized that the § 4(f) evaluation could not be conducted until the § 106 identification process was completed. *Id.* at 371-72.

The District of Columbia Circuit held that the agency was required to complete the § 4(f) process for the entire corridor project before issuing the ROD. *See id.* at 372-74 (citing 23 C.F.R. § 771.135); *see also Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1087-88 (10th Cir. 2004) ("Section 4(f) regulations clearly require the FHWA to make the requisite Section 4(f) evaluations prior to issuing an ROD approving a proposed construction project."); *Benton Franklin Riverfront Trailway & Bridge Comm. v. Lewis*, 701 F.2d 784, 788-89 (9th Cir. 1983) (criticizing agency for failing to complete Section 4(f) analysis earlier).[8]

**[15]** We hold, consistently with the District of Columbia Circuit's decision in *Corrider H*, that an agency is required to complete the § 4(f) evaluation for the entire Project prior to issuing its ROD.

---

[8]The Agencies' reliance on *City of Alexandria v. Slater*, 198 F.3d 862 (D.C. Cir. 1999), is misplaced. In *Slater*, the agency identified historic properties along the entire project corridor, and documented its findings in a Memorandum of Agreement and a § 4(f) evaluation; the agency deferred only the determination of whether some ancillary construction activities might also impact § 4(f) properties. *Id.* at 873. In contrast, here the Agencies concede that they have conducted the § 106 identification process and § 4(f) evaluation only as to the Sand Creek Byway phase of the project, and have not conducted the necessary identification and evaluation for the other phases of the Project.

**[16]** The Agencies concede that they have taken a phase-by-phase approach, that they have not completed the § 4(f) evaluation for the entire Project, and that they already have issued the ROD. The Agencies have accordingly violated § 4(f). We therefore reverse the district court's grant of summary judgment on this issue.

## B.   "Use" of the Depot

In the 1999 EIS, the Agencies performed a § 4(f) evaluation with respect to the Depot. The Agencies concluded that there was no feasible and prudent alternative to the use of the Depot and that the proposed action included all possible planning to minimize harm to the Depot, thus allowing the Project to proceed. *See* 49 U.S.C. § 303(c)(1).

NICAN does not challenge the Agencies' § 4(f) evaluation contained in the 1999 EIS. Instead, NICAN argues that the Agencies acted arbitrarily and capriciously when they determined that modifications to the Project set forth in the 2005 EA will not "use" the Depot for purposes of § 4(f), and that a formal § 4(f) evaluation was therefore not required in relation to those modifications.

The modifications at issue came about as a result of the Agencies' agreement with the SHPO to perform certain repairs and make certain improvements to the Depot. The agreed-to repairs include removing the sandstone water table course, replacing missing bricks, repointing all masonry joints, and reconstructing a concrete curb and walkway at the west side. The agreed-to improvements include paving the Depot access road and parking areas, adding lighting to the pedestrian parking area, and building a handicap access ramp and brick pathway connecting the parking area to the Depot. These "modifications" will not have an "adverse effect" on the Depot, but are instead *improvements* that inure to the benefit of the Depot. *See* 49 U.S.C. § 303(c), (d)(2). And, although occurring on Depot property, these improvements do

not "permanently incorporate[ ] [the land] into a transportation facility" to bring it within the parameters of § 4(f). *See* 23 C.F.R. § 771.135(p)(1) (2000);[9] *see also Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 533 (9th Cir. 1994) (holding that properties were not actually or constructively used in a proposed project where the project would not "substantially impair the current features, activities and attributes" of parklands and bike paths). These improvements do not, therefore, involve a "use" of the Depot property under § 4(f). *See* 49 U.S.C. § 303(c), (d)(2); 23 C.F.R. § 771.135(p)(1) (2000).

Other modifications to the Project—such as installing a construction fence and mesh grating, and excavating a trench —involve activities that are temporary and minor, that have been approved by the SHPO, and from which the land will be fully restored. These activities also do not, therefore, involve a "use" of the Depot property under § 4(f). *See* 23 C.F.R. § 771.135(p)(7) (describing when a temporary occupancy is so minimal it does not constitute a "use").

**[17]** We hold that the Agencies did not act arbitrarily or capriciously in determining that the modifications to the Project discussed in the 2005 EA would not "use" the Depot property within the meaning of § 4(f).

## III.   Remedy

Although we conclude the Agencies violated § 4(f) by failing to conduct the § 4(f) evaluation for the entire Project prior to issuing the ROD, we find it unnecessary to enjoin the entire Project while the Agencies complete the necessary evaluation. All parties agree that the § 4(f) evaluation has been completed with respect to the Sand Creek Byway phase of the Project.

---

[9]This was the regulation in effect at the time of the Agencies' decision; it has now been removed and repromulgated in substantially the same form at 23 C.F.R. § 774.17 (2008).

The Sand Creek Byway has independent viability, beginning and ending at points on existing US-95, and the Sand Creek Byway will accomplish many goals of the overall Project.

**[18]** On the unique facts of this case, we conclude that the scope of injunctive relief should be limited to precluding the Agencies from commencing construction of the remaining three phases of the Project until the § 4(f) evaluation has been fully completed. *See, e.g., Sierra Club v. Bosworth*, 510 F.3d 1016, 1034 (9th Cir. 2007) (after noting that some projects were already approved and in operational stages, limiting injunctive relief to projects that were approved after initiation of the lawsuit and giving the district court discretion to also exclude some projects that were approved later but already at or near completion); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 739 (9th Cir. 2001) (limiting the scope of injunctive relief to two components of vessel management plan). We therefore remand to the district court with instructions to enter an appropriate injunction in accordance with our decision. *See Nat'l Parks*, 241 F.3d at 740.[10]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS**. Each party to bear its own costs on appeal.

---

[10]Nothing in this decision shall be deemed to preclude NICAN or any other interested party from challenging the Agencies' § 106 identification process and § 4(f) evaluation, once completed, with respect to the remaining phases of the Project.