**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 22 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SUMMIT LAKE PAIUTE TRIBE OF NEVADA; WARNER BARLESE, Chairman of the Summit Lake Paiute Tribe, | No. 11-70336 |
| Petitioners, | |
| v. | MEMORANDUM[*] |
| UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| Respondent, | |
| RUBY PIPELINE, L.L.C., | |
| Respondent-Intervenor. | |

On Petition for Review of an Order of the
Bureau of Land Management

Argued and Submitted October 11, 2011
Portland, Oregon

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Before: BERZON and N.R. SMITH, Circuit Judges, and SMITH, District Judge.[**]

The Summit Lake Paiute Tribe (the Tribe) filed a Petition for Review challenging the Bureau of Land Management's (BLM) decision to amend the rights of way and temporary use permits granted to Ruby Pipeline, L.L.C. ("Ruby"). That decision re-routed a four-mile segment of the pipeline, shifting it roughly one half mile north of its original route.

1. *Mootness*:

Ruby and BLM argue that, because the construction of the pipeline is now complete, the Tribe's National Historic Preservation Act and National Environmental Policy Act challenges are moot. In determining mootness, "the question is not whether the precise relief sought . . . is still available. The question is whether there can be any effective relief." *Nw. Envtl. Def. Ctr. v. Gordon,* 849 F.2d 1241, 1244–45 (9th Cir. 1988) (quoting *Garcia v. Lawn,* 805 F.2d 1400, 1403 (9th Cir. 1986)); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002).

The majority of the harm the Tribe sought to avoid in this case stemmed from the construction of the pipeline. At oral argument, Petitioners stated that they

[**]     The Honorable William E. Smith, District Judge for the U.S. District Court for the District of Rhode Island, sitting by designation.

2

are not seeking to have the pipeline moved, as digging it up and burying it again would only cause more damage. Nevertheless, effective relief is still available as long as the ongoing effects the pipeline continues to have on the Tribe's cultural property, such as the effects of maintaining the pipeline's right of way or lingering effects from construction, can be mitigated. We conclude that the Tribe's claims are not moot to the extent that further mitigation could provide relief, while those claims that depend on re-routing the pipeline are moot. Below, we review mootness under this standard for each claim raised.

2. *National Historic Preservation Act (NHPA)*:

**a.** The Tribe argues that BLM violated the NHPA and its accompanying regulations by (1) not consulting with the Tribe; (2) not considering its proposed re-routing in good faith; and (3) not analyzing the impacts the re-route would have on the Tribe's cultural properties. Because remedying these alleged defects could potentially lead to the development of new mitigation measures, these claims are not moot.

**b.** The Tribe argues that BLM did not adequately consult with it regarding the proposed re-route, depriving it of its right to "participate in the resolution of adverse effects" as required by the regulations. 36 C.F.R. § 900.2(c)(2)(ii)(A). In addressing the adequacy of consultation, we consider both the consultation on the

3

re-routing and the consultation that was conducted in connection with the initial approval of the project. *See Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the Interior*, 608 F.3d 592, 608–09 (9th Cir. 2010). Indeed, it was BLM's consultation with the Tribe, which started at least as early as January 2009, that led it to propose the re-route in the first place, and BLM conducted four site visits with the Tribe to try to ascertain the boundaries of the traditional cultural property. We hold that this process, taken as a whole, fulfilled BLM's consultation obligation.

**c.** The Tribe next argues that BLM did not conduct good faith research to determine the boundaries of the Tribe's traditional cultural property ("TCP"), observing, in particular, that BLM did not conduct any background research. As the Tribe acknowledges, however, a survey of the re-route *was* conducted, and that survey determined that the re-route "avoids direct impacts to the Summit Lake TCP." The regulations specify that a "reasonable and good faith effort . . . may include background research, consultation, oral history interviews, sample field investigation, and field survey." 36 C.F.R. § 800.4(b)(1). There is no requirement that a good faith effort include *all* of these things, and a thorough field survey, as was conducted here, is at least as reliable as background research. The regulations also permit the agency to "take into account past planning, research, and studies," *id.*; the research conducted during consideration of the project as a whole did

4

include background research. We therefore conclude that BLM made the required "reasonable and good faith effort" to identify historic properties.

**d.** Lastly, the Tribe argues that BLM failed to analyze the effects the re-route would have on its traditional cultural property (TCP). BLM's determination of NEPA adequacy for the re-route, however, did analyze the re-route's impact on the TCP, including its impact as compared with the original route. Furthermore, BLM's analysis resulted in a determination of a boundary for the Tribe's TCP, and the re-route was outside that boundary. We hold that BLM did analyze the pipeline's impacts on the Tribe's TCP.

3. *National Environmental Policy Act (NEPA)*:

**a.** The Tribe maintains that BLM violated NEPA by failing to supplement its environmental impact statement before approving the re-route. As with the NHPA claims, supplementation could lead to further study of the pipeline's impacts and the development of new mitigation measures. This claim is therefore not moot.

**b.** An agency must supplement an environmental impact statement if "the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

impacts." 40 C.F.R. § 1502.9(c)(1); *see also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373 (1989). In considering the re-route, BLM prepared a "determination of NEPA adequacy," which concluded that no supplementation to the environmental impact statement was necessary.

We have approved of the use of such "determination" documents as the BLM prepared here, *see Price Rd. Neighborhood Ass'n v. United States Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997), while noting that they are not to replace supplemental environmental assessments or impact statements and may only be used "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000). When an agency takes the requisite "hard look" and "determines that the new impacts will not be significant (or not significantly different from those already considered), then the agency is in full compliance with NEPA." *North Idaho Community Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1154–55 (9th Cir. 2008). Such determinations will only be set aside if they are arbitrary and capricious. *Id.* at 1155.

The Tribe contends that BLM's TCP boundaries, established after the final environmental impact statement was completed, are wrong, and that the pipeline,

even as re-routed, still passes through the TCP. The legal adequacy of BLM's determination that it need not supplement the environmental impact statement turns on its contrary factual conclusion regarding the size of the TCP, resulting in its repeated assertion that the re-routed pipeline "avoids direct impacts to the Summit Lake TCP." If this latter statement is accurate, it was reasonable to conclude that the circumstances after the proposed re-routing would not be significantly different from those when the environmental impact statement was drafted, as no TCP would be impacted after the re-route. In other words, the *existence* of the TCP was certainly significant new information, but if the pipeline avoided it entirely, then its effects would not be significantly different from those discussed in the environmental impact statement, and no supplementation would be required. In this case, determining the size of the TCP, and the determination that the re-routed pipeline passed outside it, was the type of threshold factual inquiry that may be made in a "determination" document.

The BLM's factual conclusion regarding the boundaries of the TCP was not arbitrary and capricious. BLM and the Tribe worked together to sketch out the boundaries of the TCP. When the Tribe suggested that the TCP was larger than that acknowledged by BLM, BLM conducted a series of site visits in which the Tribe had an opportunity to bring to BLM's attention sites that would suggest a

larger TCP. None were found. While the Tribe blames BLM for its failure to locate any sites indicating a larger TCP during these site visits, BLM's reliance on the visits and on the pedestrian survey of the re-route conducted by Ruby's cultural resources subcontractor was not arbitrary and capricious. The record also shows that BLM considered the Tribe's main evidence for a larger TCP, the Bengston report, and determined that its own site visits and surveys were more reliable.

In short, BLM's conclusion regarding the size of the TCP was reasoned and thorough; while it may have been arguable, it was not arbitrary and capricious. Taking this conclusion as accurate, it was reasonable to conclude that the impacts of the re-route would not be "significantly different from those already considered" in the environmental impact statement. *North Idaho*, 545 F.3d at 1155. We therefore conclude that BLM did not act arbitrarily and capriciously in determining that no supplement to the environmental impact statement was necessary.

The petition for review is **DENIED**.